**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION - CINCINNATI**

| | |
|---|---|
| TOTAL QUALITY LOGISTICS, LLC, ) <br> 4289 IVY POINTE BLVD.  : <br> CINCINNATI, OH 45245    ) <br>                          : <br>        **Plaintiff,**       ) <br>                          : <br> v.                       ) <br>                          : <br> **BRETT N. BRYANT**         ) <br> 6228 VINEYARD TRACE      : <br> AMELIA, OH 45102         ) <br>                          : <br> **AND**                    ) <br>                          : <br> **NICHOLAS E. BRYANT**     ) <br> 6228 VINEYARD TRACE      : <br> AMELIA, OH 45102         ) <br>                          : <br> **AND**                    ) <br>                          : <br> **R-EXPRESS LLC (DBA R-EXPRESS** ) <br> **INTERNATIONAL)**           : <br> RAED ELHAYEK            ) <br> 7588 CENTRAL PARKE BLVD. : <br> SUITE 120               ) <br> MASON, OH 45040         : <br>                          ) <br> **AND**                    : <br>                          ) <br> **GLOBAL LINK LOGISTICS, INC.** : <br> C/O STATUTORY AGENT      ) <br> RANIA ALBATTA          : <br> 7577 CENTRAL PARKE BLVD ) <br> MASON, OH 45040         : <br>                          ) <br> **PLEASE ALSO SERVE AT:**   : <br> RANIA ALBATTA          ) <br> 7588 CENTRAL PARKE BLVD : <br> SUITE 352               ) <br> MASON, OH 45040         : <br>                          ) <br>        **Defendants.**       : | Case No.: __**1:20-cv-671**__ <br><br> Judge: _____ <br><br><br> **VERIFIED COMPLAINT FOR** <br> **INJUNCTIVE RELIEF AND DAMAGES** |

1

For its Complaint against Defendants Brett N. Bryant ("Brett"), Nicholas E. Bryant ("Nick"), R-Express, LLC (dba R-Express International) ("R-Express"), and Global Link Logistics, Inc. ("Global"), Plaintiff, Total Quality Logistics, LLC ("TQL"), states as follows:

## NATURE OF THE ACTION

1. Brett and Nick are both former employees of TQL. Nick is Brett's father. Nick is employed by R-Express and/or Global. Brett began working at TQL on July 13, 2020. Less than ten days later, at his father's request, Brett sent TQL's confidential and proprietary business information, such as pricing, customer names, and margins, to his father. Brett admitted this fact to TQL and admitted to TQL that he did this so his father could underbid TQL and steal its customers. At the respective start of their employment with TQL, Brett and Nick each signed an Employee Non-Compete, Confidentiality and Non-Solicitation Agreement (collectively, the "Agreements"). (*See*, Agreements, attached as Exhibits 1 and 2). In the Agreements, Nick and Brett promised not to disclose any of TQL's confidential or proprietary information.

2. Nick and Brett are violating their confidentiality obligations by stealing confidential and proprietary information and using it for their own financial gain at R-Express and Global. Brett also has violated his covenant to not compete with TQL. That fact and other intentional acts of the Defendants set forth herein constitute breach of contract, tortious interference, and misappropriation of trade secrets, and civil conspiracy for which TQL seeks injunctive relief, compensatory damages, and the recovery of attorney fees incurred.

## PARTIES, JURISDICTION, AND VENUE

3. TQL is an Ohio limited liability company with its principal place of business at 4289 Ivy Pointe Blvd., Cincinnati, Ohio 45245, in Clermont County, Ohio. TQL provides freight brokerage and third-party logistics services to customers throughout the United States.

4. Brett resides at 6228 Vineyard Trace, Amelia, OH 45102.

5. Nick resides at 6228 Vineyard Trace, Amelia, OH 45102.

6. Brett was employed by TQL from July 13, 2020 to August 20, 2020, in TQL's Milford, Ohio office.

7. Nick was employed by TQL from November 7, 2005 to May 24, 2008, in TQL's Cincinnati, Ohio office.

8. Upon information and belief, R-Express is an Ohio corporation that conducts business competitive with TQL in a number of states, including Ohio. R-Express maintains a principal place of business in Mason, OH. R-Express provides third-party logistics services across the United States and internationally.

9. Global is an Ohio corporation that conducts business competitive with TQL in a number of states and, upon information and belief, including Ohio. Global maintains a principal place of business in Mason, OH. Global provides third-party logistics services across the United States and internationally.

10. Nick, Brett, and TQL agreed that any dispute regarding non-competition and confidentiality can be brought in the Southern District of Ohio. (See Exhibits 1 and 2.) Each of the Agreements state that Ohio law governs any dispute regarding non-competition and confidentiality.

11. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, with reference to 18 U.S.C. § 1836.

12. This Court has jurisdiction over Defendants because, among other reasons, Defendants intentionally misappropriated TQL's trade secrets, and committed tortious acts against a company located in Clermont County, Ohio, TQL.

13. Venue is proper in this Court because all of the Defendants reside, or have their principal place of business, within this judicial district and division, and because Defendants intentionally misappropriated TQL's trade secrets and committed tortious acts against TQL as a company located in Clermont County, Ohio.

## FACTS

### I. TQL, R-EXPRESS AND GLOBAL ARE COMPETITORS.

14. TQL is one of the largest third-party logistics companies in the U.S. and operates in the highly competitive freight brokerage industry. TQL provides freight brokerage services, third-party logistics services, truck brokerage services, and assistance with supply-chain management throughout the U.S. TQL has operated as a federally authorized freight broker since 1997.

15. TQL's customers are companies that want to ship goods from one location to another. Included among these customers are companies that want to ship their own goods, and other freight brokers who already agreed to ship goods on behalf of another customer, but need assistance finding a carrier to fulfill the shipment.

16. TQL does not own, operate, or lease any of its own trucks or trucking equipment, nor does it employ any drivers to haul freight. Rather, TQL engages and coordinates independent motor carriers that are able and willing to haul freight at the times and places required by TQL's customers.

17. Global is a competitor of TQL. According to its LinkedIn profile, it provides freight brokerage services "around the globe" and "operates and moves freight internationally and nationally." Global provides many services, including "over the road, rail, intermodal, heavy haul/over-dimensional, air shipments, ocean shipment." Global has active freight

4

brokerage licensure through the U.S. Department of Transportation's Federal Motor Carrier Safety Administration under Docket Number MC 01062139, which was obtained September 27, 2019. Global is owned by Rania Albatta.

18. R-Express is owned by Raed Elhayek, the husband of Albatta, and operates together with Global as a competitor of TQL. R-Express provides the motor carrier services, and, according to its website (www.rexpressint.com), it is "a specialized expedited shipping courier specializing in all types of freight shipping." It purports to have a "growing customer base in all 50 states in the U.S. and all regions in Canada" and "provides 24/7 expedited delivery services across the United States and Canada." R-Express has an active common motor carrier license through the U.S. Department of Transportation's Federal Motor Carrier Safety Administration under Docket Number MC 781349, reinstated on January 13, 2015.

19. R-Express and Global operate out of the same business park in Mason, Ohio.

20. The third-party logistics industry and the freight-shipping industry are extremely competitive. Relationships with customers, carriers, and other brokers are critical to success.

## II. NICK AND BRETT ARE TRAINED BY TQL AND AGREED TO KEEP TQL'S TRADE SECRETS CONFIDENTIAL.

21. TQL spends significant amounts of time, money, and other resources to develop relationships with new customers and strengthen relationships with existing customers. TQL has also made substantial investments in developing and protecting the secrecy of its proprietary systems, processes, and procedures that it uses to manage its operations and to compete in the competitive logistics and freight industry.

22. TQL takes significant measures to protect its trade secrets, customer relationships, and other confidential information. For example, before beginning employment at TQL, all freight brokers, as well as many other types of employees, must sign restrictive covenants that

5

restrict their ability to compete with TQL, to solicit TQL's customers or employees, or to disclose or misuse TQL's confidential information.

23. TQL utilizes individualized passwords that must be routinely changed, for electronic access to its proprietary and confidential information. TQL employs internal system controls to prevent employees from downloading, physically removing and printing certain information, as well as keycards and badges for entry to its offices.

24. Nick sought employment with TQL, was hired in November, 2005, and became a Logistics Account Executive ("LAE") or freight broker for TQL. His employment terminated in May, 2008.

25. Brett sought employment with TQL, was hired in July, 2020, and became a Logistics Support Agent ("LSA") for TQL. TQL terminated Brett's employment on August 20, 2020.

26. TQL provided Nick with extensive training on TQL's strategies and methods to succeed within the industry, including, without limitation, training on TQL's services, customers, pricing structure, sales strategies, and general operations. TQL's logistics training program generally takes between 8 and 26 weeks to complete. Brett, likewise, received training on TQL's customers, carriers, general operations, and services with training taking up to 4 weeks to complete. Upon information and belief, neither Brett nor Nick had prior experience in freight brokerage or the third-party logistics industry before joining TQL. Throughout their employment at TQL, Brett and Nick acquired detailed knowledge of TQL's unique operations, including, without limitation: shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services. Brett and Nick also had extensive access to TQL's confidential and highly proprietary information for use in the

performance of their job duties, including: proprietary software, operating policies and procedures, financial records (such as credit history and other similar information about current and prospective customers, suppliers, and motor carriers), information about pricing and the manner and mode of doing business, the terms of TQL's business dealings and relationships with customers and motor carriers, contracts and agreements, sales lists and strategies, and detailed customer and motor carrier lists and information.

27. Brett and Nick were also required to manage relationships with TQL's existing customers and/or motor carriers and to develop prospective business relationships. Brett and Nick had regular contact with those existing and prospective companies, and, in fact, served as a point of contact from TQL for many of those businesses.

28. Nick's Agreement states:

> **5. Confidential Information is for TQL's Use Only.** Unless [Nick] has prior written consent from TQL, [Nick] shall not at any time during the course of [Nick's] employment by TQL, and at all times thereafter, use for any purpose or publish, copy, disclose, or communicate to any individual, firm, corporation, or other business entity other than TQL, any Confidential Information, except as properly necessary and authorized by TQL in the conduct of TQL's business. [Nick] agrees that all information disclosed to [Nick], or to which [Nick] has access during the period of his or her employment, that there is any reasonable basis to believe to be, or that appears to be treated by TQL as, Confidential Information, shall be presumed to be Confidential Information hereunder.

29. Brett's Agreement states as follows:

> **5. Confidential Information is for TQL's Use Only**. Unless [Brett] has prior written consent from TQL, [Brett] shall not at any time during the course of [Brett's] employment by TQL, and at all times thereafter, use for any purpose or publish, copy, disclose, or communicate to any individual, firm, corporation, or other business entity other than TQL, any Confidential Information, except as properly necessary and authorized by TQL in the conduct of TQL's business. [Brett] agrees that all information disclosed to [Brett] or to which [Brett] has access during the period of [Brett's] employment shall be presumed to be Confidential Information

hereunder if there is any reasonable basis to believe it to be Confidential Information or if TQL appears to treat it as confidential.

30. Nick's Agreement and Brett's Agreement each state:

   **6. Return of Company Property**. Upon termination of employment or upon request by TQL for any reason, [Nick/Brett] will immediately deliver to TQL all originals and all copies of all documents and other materials obtained from or belonging to TQL, including but not limited to all Confidential Information, regardless of form, in [their] possession, custody or control, including but not limited to any TQL files, documents (including any containing customer information), computer data, or other media however stored, and [they] will retain no copy of any such document, data or other materials.

31. Brett's Agreement states:

   **7. Presumption Regarding Confidential Information**. [Brett] agree that (his) engaging in any form of employment relationship with a Competing Business, as defined in Section 9 below, would necessarily result in (him) revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

32. Brett's Agreement further states:

   **9(b). Covenants and Remedies** [Brett] agrees that, during the course of his . . . employment. . . and for a period of one (1) year after termination or cessation of [Brett's] employment for any reason: (i) [Brett] will not, directly or indirectly . . . consult with, …engage in, or have any other interest in…any Competing Business…(ii) [Brett] will not directly or indirectly as an . . . agent, … consultant, . . . or in any other capacity or manner whatsoever, whether or not for compensation, participate in any transportation-intermediary business …(iii) [Brett] will not, directly or indirectly, solicit any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any action, to divert business from TQL; (iv) [Brett] will not, directly or indirectly, interfere with, tamper with, disrupt, or attempt to disrupt any contractual or other relationship, or prospective relationship, between TQL and any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor of TQL[;] and…(vi) it is further understood and agreed that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which [Brett] violates any provision of this Agreement.

33. Nick's Agreement (at 8(c)) and Brett's Agreement (at 9(c)) each state:

    **Trade Secrets.** [Nick/Brett] recognize and acknowledge that TQL's trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information as they may exist from time to time are valuable, special, and unique assets of TQL's business, access to and knowledge of which are essential to performance of [Nick's/Brett's] duties hereunder. [Nick/Brett] will not hereafter disclose such trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever, nor shall [Nick/Brett] make use of any such property for [their] own purpose or the benefit of any person, firm, corporation, association, or any entity other than TQL under any circumstance.

34. Nick's Agreement (at 8(d)) and Brett's Agreement (at 9(d)) each state:

    **Reasonableness of Restrictions**. [Nick/Brett] recognize that the foregoing geographic, duration, and content restrictions are reasonable and properly required for the adequate protection of the business of TQL from the disclosure of Confidential Information and unfair competition.

35. Nick's Agreement (at 8(e)) and Brett's Agreement (at 9(e)) each state:

    **Injunction**. If there is a breach or threatened breach of any part of this Agreement, TQL shall be entitled to an injunction restraining [Nick/Brett] from such breach or threatened breach. Alternatively and additionally, TQL, in its sole discretion, may pursue a claim for damages in tort and/or contract resulting from any breach or threatened breach of this Agreement…if [Nick/Brett] are found by a court of competent jurisdiction to have violated the terms of this Agreement, [they] shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL.

36. Nick and Brett each agreed that their respective Agreements would be governed by Ohio law.

### III. NICK AND BRETT CONSPIRE TO STEAL TQL'S TRADE SECRETS AND USE THEM TO COMPETE AGAINST TQL AT R-EXPRESS AND GLOBAL.

37. Upon information and belief, sometime after leaving TQL, Nick commenced employment with XPO Logistics. Nick became employed by R-Express in October, 2019.

Upon information and belief, as a part of his employment with R-Express, Nick was asked to set up a brokerage business at Global, which he did.  Upon information and belief, Nick is either employed by Global or is a consultant for it.

38. Less than 10 days after becoming employed by TQL, Brett began to share TQL's confidential and proprietary information to Nick, Global and R-Express.  Brett stole and shared information relating to customer leads, TQL pricing, and lanes.  Nick, Brett's father, asked Brett, who is in his twenties, to share this information with Nick.  Brett and Nick both knew that such information was confidential and proprietary to TQL since each had executed their respective Agreements.  Nick and Brett also live together.

39. On or about July 22, 2020, Brett provided Nick information about three TQL customers.  That information included leads on specific loads for those entities, contact information for some of those entities, and TQL's pricing and margins for those specific loads.  Nick forwarded the information to other employees of R-Express and/or Global and told them "happy hunting."

40. On or about July 23, 2020, Brett provided Nick information about three additional TQL customers.  That information included leads on specific loads for those entities, contact information for some of those entities, and TQL's pricing and margins for those specific loads.  Nick forwarded the information to other employees of R-Express and/or Global.  Nick told other employees that Brett would get "more detailed information starting next week" and that he "told [Brett] to find the ones with the biggest margins so we will have an easier time getting in."

41. TQL terminated Brett's employment on August 20, 2020.  Brett admitted to TQL that Nick asked him to steal TQL's proprietary and confidential trade secrets and share them with Nick.

10

42. Brett admitted to TQL that Nick stated that his getting TQL's proprietary and confidential trade secrets would help Nick's business.

43. Brett stated to TQL that he provided "a couple of leads" to Nick.

44. Brett admitted to TQL that he knew that his Dad was calling on the customers Brett identified for Nick.

45. Brett admitted to TQL that Nick intended to use TQL's pricing information so that R-Express and/or Global could undercut TQL's bids. Brett admitted that would be stealing business from TQL.

46. Brett admitted to TQL that he knew he should not have provided TQL's confidential and proprietary information to his Dad. He identified for TQL specific TQL customers for which he had shared confidential and proprietary information and trade secrets with Nick.

47. Brett admitted to orally communicating TQL's confidential and proprietary trade secrets to his father Nick. He admitted telling his Dad about one or two TQL customers a day. Brett intentionally communicated the information orally to not draw suspicion from TQL. Because Brett and Nick live together, it made it easier to communicate the information orally.

48. When they joined TQL, Nick and Brett agreed that TQL's "Confidential Information," whether or not formally designated as such, was vital to the success of TQL's business and that any unauthorized use or disclosure of TQL's Confidential Information would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL. (*See*, Ex. 1 and 2)

49. Nick and Brett also agreed that TQL's Confidential Information was a proprietary trade secret with significant economic value, compiled through a substantial investment of time and money by TQL, and not common knowledge throughout the Industry.

50. Nick and Brett promised that they would at all times refrain from using, sharing, or disclosing TQL's Confidential Information to any individual or business entity (except as authorized by TQL in the conduct of TQL's business or as required by law).

51. Brett and Nick acknowledged that association with a business competitive with TQL would result in them revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

52. Brett further agreed that the running of the one (1) year non-competition restriction "shall be tolled during any time period during which (they) violate any provision of the Agreement."

53. TQL's trade secrets, customer lists, and other "Confidential Information" are valuable, special, and unique assets of TQL's business that Nick and Brett agreed not to disclose to anyone for any reason, except as required by law. Nick and Brett further agreed that they would not make use of TQL's Confidential Information for anyone other than TQL.

54. Brett agreed that the content, time, and geographic restrictions placed on him by his Agreement were reasonable and required for the protection of TQL's business

55. Nick and Brett agreed that a breach or threatened breach of any part of their respective Agreements, as described above, would entitle TQL to an injunction.

56. R-Express and Global are each a "Competing Business" under the Agreements. They are engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services in the United States.

57. In consideration of Nick's and Brett's respective Agreements set forth above, TQL hired them. TQL would not have allowed them to gain knowledge of its proprietary customer information or access to TQL's key customer relationships, if they had not executed their respective Agreements.

IV. **CAUSES OF ACTION.**

### FIRST CLAIM FOR RELIEF
### Breach of Contract
### (Against Nick and Brett)

58. TQL incorporates all of the previous paragraphs set forth in this Complaint as if fully set forth here.

59. TQL and Nick entered into their respective Agreement.

60. TQL and Brett entered into their respective Agreement.

61. The Agreements are valid and legally enforceable contracts.

62. The Agreements are reasonable.

63. TQL performed its obligations under the Agreements.

64. As more fully described above, Nick and Brett breached their respective Agreements with TQL. As more fully described above, Nick and Brett each breached their obligations not to disclose TQL's confidential and proprietary trade secrets and not to use that information to compete with TQL.

65. As more fully described above, Brett breached his agreement by providing services to a competitor of TQL while Brett was employed by TQL.

66. As more fully described above, Brett and Nick have also breached the Agreement by using TQL's confidential and proprietary trade secrets to divert work to R-Express and Global.

67. As a direct and proximate cause of the actual or threatened unlawful conduct of Nick and Brett, TQL has suffered and will continue to suffer irreparable harm.

68. Monetary damages alone will not be sufficient to remedy all of the harm caused to TQL by the breaches of Nick and Brett of their respective Agreements.

69. Wherefore, TQL requests a temporary restraining order, preliminary injunction, and permanent injunction commanding Nick and Brett to comply fully with their respective Agreements, and as to Brett, as extended as the result of the agreed tolling provision triggered by his breach. TQL further requests recovery of its attorneys' fees and compensatory damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets Pursuant to the Defend Trade Secrets Act**
**(Against All Defendants)**

70. TQL incorporates all of the previous paragraphs set forth in this Complaint as if fully set forth here.

71. As more fully described above, TQL owns trade secrets and develops and maintains confidential and highly proprietary information, including, among other items, information about its business dealings and relationships with its customers, customer lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with customers and vendors), marketing, and sales lists and strategies.

72. As more fully described above, TQL derives independent economic value, actual and potential, from its confidential and proprietary trade secrets not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, including TQL's competitors.

73. As more fully described above, TQL takes reasonable means and efforts to maintain the secrecy of its confidential and proprietary trade secrets.

74. TQL's confidential and proprietary information is protected, in whole or in part, as a trade secret within the meaning of 18 U.S.C. § 1836.

75. On information and belief, the Defendants have willfully misappropriated or threatened to misappropriate TQL's trade secrets for use against TQL and for the benefit of the Defendants within the meaning of 18 U.S.C. § 1836.

76. As a direct and proximate result of the Defendants' actual or threatened misappropriation of TQL's trade secrets, TQL has suffered, and will continue to suffer, immediate, substantial, and irreparable harm.

77. TQL has no adequate remedy at law.

78. Monetary damages alone will not be sufficient to remedy all of the harm caused to TQL by Defendants' actual or threatened misappropriation of trade secrets.

79. Wherefore, TQL requests a temporary restraining order, preliminary injunction, and permanent injunction prohibiting the further use and misappropriation of TQL's trade secrets. TQL further requests recovery of its attorneys' fees and compensatory damages for the willful actions taken by Defendants in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**Tortious Interference with Contract**
**(Against All Defendants)**

80. TQL incorporates all of the previous paragraphs set forth in this Complaint as if fully set forth here.

81. The Agreements are valid and binding agreements.

82. Defendants have each been aware of the Agreements. Nick, R-Express and Global were aware of Brett's contract since Nick had signed a similar agreement with TQL. Brett, R-Express and Global were aware of Nick's agreement.

83. Despite this knowledge, as more fully described above, Defendants have purposefully and intentionally interfered with the Agreements, by, among other things, facilitating Brett's and Nick's disclosure of TQL's confidential and proprietary trade secrets in violation and breach of their respective Agreements. These actions were done so that R-Express and Global could undercut TQL's pricing and unfairly compete with TQL's customers. Defendants' actions are with without privilege or justification.

84. Defendants tortiously, willfully, and maliciously ignored the contractual obligations that Brett and Nick owe to TQL, without any justifiable excuse, and in bad faith. Defendants acted with purpose or desire to interfere with the performance of the Agreements. Defendants knew that interference was certain or substantially certain to occur as a result of their actions.

85. As a direct and proximate result of Defendants actions, TQL has been damaged in an amount to be determined at trial. Such damage includes, upon information and belief, lost sales revenue, customer relationships and fair competition.

**FOURTH CLAIM FOR RELIEF**
**Tortious Interference with Business Relationships**
**(Against All Defendants)**

86. TQL incorporates all of the previous paragraphs set forth in this Complaint as if fully set forth here.

87. TQL has business relationships and/or contracts with many entities in need of third-party logistics services. As more fully described above, TQL has business relationships

16

with the entities about which Brett disclosed TQL's confidential and proprietary information and trade secrets.

88. Defendants knew of TQL's business relations with the entities about which Brett disclosed TQL's confidential and proprietary information and trade secrets. Defendants further knew of TQL's prospective business relationships with those entities and other entities throughout the United States.

89. Despite this knowledge, as more fully described above, Defendants have purposefully and intentionally interfered with TQL's business relationships with current and prospective TQL customers. Such interference includes customers or prospective relations not yet reduced to contract. These actions were done so that R-Express and Global could undercut TQL's pricing and unfairly compete with TQL's customers and prospective customers and so that such entities would not enter into contracts with or continue a business relationship with TQL. Defendants' actions are without privilege or justification.

90. Upon information and belief, Defendants actions have caused or will cause TQL customers or prospective customers to not enter into contracts with or continue business relationships with TQL.

91. As a direct and proximate result of Defendants actions, TQL has been damaged in an amount to be determined at trial. Such damage includes, upon information and belief, lost sales revenue, customer relationships and fair competition.

## **RELIEF REQUESTED**

WHEREFORE, TQL respectfully requests judgment in its favor and against Defendants as follows:

A. Award TQL a temporary, preliminary, and permanent injunction as set forth above and order that:

1. Brett Bryant is restrained from violating his Agreement;

2. Defendants are restrained from maintaining, disclosing, or using TQL's confidential and proprietary information for any reason;

B. Order Defendants to pay TQL compensatory damages in an amount to be determined at trial;

C. Award punitive damages;

D. Award TQL attorney fees, pre-judgment interest, costs and expenses, incurred in connection with this action; and

E. For all purposes combined, including the value of any injunctive relief, award TQL on all counts and claims for all requested relief.

F. Award TQL such other and further relief as this Court finds just and proper.

Respectfully submitted,

OF COUNSEL:

GRAYDON HEAD & RITCHEY LLP
312 Walnut St., Suite 1800
Cincinnati, OH 45202
Phone:  (513) 629-2799
Fax:     (513) 651-3836

*/s/ Scott K. Jones*
Scott K. Jones (0069859)
Darren W. Ford (0086449)
Kellie A. Kulka (0095749)
GRAYDON HEAD & RITCHEY LLP
7570 Bales Street, Suite 220
Liberty Township, OH 45069
Phone:  (513) 755-4501
Fax:     (513) 755-9588
sjones@graydon.law
dford@graydon.law
kkulka@graydon.law

*Attorneys for Total Quality Logistics, LLC*

10502791.1

## VERIFICATION

STATE OF OHIO )
) ss.
COUNTY OF CLERMONT )

I, Marc Bostwick, being duly cautioned and sworn, state that I am authorized to act as an agent of Plaintiff for the purpose of verifying the Complaint herein in accordance with the Ohio Rules of Civil Procedure. To the extent I have personal knowledge of the matters alleged in the Complaint, the information is true and accurate to the best of my knowledge and belief. As to any matters for which I do not have personal knowledge, I am authorized by Plaintiff to state that Plaintiff is informed and believes that the allegations of the Complaint are true and accurate to the best of its knowledge and belief.

*/s/ Marc K. Bostwick*
Marc Bostwick

## NOTARY PUBLIC

Subscribed and sworn by Marc Bostwick before me, a Notary Public, on this 26th day of August, 2020.

Lindsay Sadlowski, Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration Date
Sec 147.03 RC

*/s/ Lindsay Sadlowski*
Notary Public

**TO THE CLERK:**

Please serve Defendants by certified mail, return receipt requested. Thank you.